We're here to hear argument in Ambrico v. USSteel. Mr. McDonnell, were you asked whether you can observe? I did, Your Honor. I asked for five minutes of rebuttal. May it please the Court, good morning. My name is Patrick McDonnell and I represent Nick Ambrico and the other appellants in this matter. We filed the appeal because we believe the trial court erred in finding that there was no constructive discharge in this particular case. Specifically, we believe there was ample evidence presented by the plaintiffs that the Merck program offered at USSteel was not free from fraud or misconduct. Specifically, we introduced evidence from senior executives in Pittsburgh for USSteel that suggested that a VERP or a voluntary plan cannot include as another component encouraging other employees to stay. Because by encouraging employees to stay, you're also encouraging certain employees to retire from what should be a voluntary retirement plan. Is there any law that says that an employer who decides to reduce force cannot pick and choose among its employees which ones it wants to stay, as long as it doesn't do it based on race or age or religion? Well, I think you only have to look at the Shawar case, which is where the retention criteria in Minimum Rift dealt with seniority and the court found manipulating retirement, manipulating retention criteria, i.e. to exclude the oldest employee, was a violation of rights under ADEA. Was a violation of the ADEA? Yes. In that particular case, the employer had a choice of which criteria he was building seniority, company seniority, or total seniority, and he chose the seniority method that discriminated against the oldest individual working in the plan. And then Judge Alito, now Justice Alito, concluded that manipulating those criteria to choose the oldest employee could be considered a violation of the ADEA and was proof of pretext under the ADEA. But absent one of the unlawful criteria, that's why I said age, race, religion, etc., is there any reason why an employer can't just say, I think Smith and Jones are good employees and I want to keep them, but I don't want to keep Clark and Hardeman? You've got to keep them, he's got lifetime tenure. There's nothing about the ADEA that's either or. Not even the ADEA. I'm just saying, as a general proposition, an employer can pick and choose among its employees in terms of when it's going to reduce force, which employees it wants to keep, right? As a general proposition, there is still an admiral doctorate in Pennsylvania, and they're permitted to pick it, you can hire and fire it any time. That's all I wanted to know. But you were claiming this violated the ADEA. Yes, the issue in this case is Pittsburgh U.S. Steel had an established procedure for an involuntary reduction of force. The established procedure was to force-rank the employees by performance evaluations and then consider years of experience as a secondary criteria. In this particular case, the roster, which we've pointed to throughout the case, impermissibly melded a number of concepts. But we never got to the involuntary separation because the voluntary retirement plan removed enough of the workforce that they didn't have to riff anyone. Well, that's the inference that the trial court chose to find in the evidence. The inference that the plaintiff is requesting to choose from the evidence is the creation of that particular plan and then during a VERP, which the senior Pittsburgh executive said, you're not supposed to talk to any of these folks about anything. That when you go out and you reach out to the other employees and say, we want to encourage you to stay, we're going to meet with you, you're included in the staffing plan, you have a job here, please don't retire, don't take this VERP. That that process also has an equal effect on those that aren't invited to the secret meetings and that aren't part of that particular secret meeting. But there were 48, 40-plus people who continued to work for USDA. Well, I think if you look at... I mean, Cedric, Jones, Henderson, Purcell, Schellheimer, and Schell? With experience and no technical background because the voluntary retirement plan left them with no need for an involuntary reduction in force. Well, that's assuming that the voluntary plan was truly voluntary. Well, what do you mean? I mean, they chose to take the VERP. They chose to take the VERP under direct evidence that the alternative to taking the VERP would be that they weren't included in the staffing plan. Well, they were told, we can't tell you. Well, they were told. I mean, we produced ample evidence that the culture in the middle was, if you weren't touched on the shoulder and told, then that's essentially, you know, you've received the death sentence. I mean, Roy Williams said, you didn't have to get punched in the face. We saw the younger guys go to meetings and be reassured. We knew that the younger guys had been reassured. We knew that in past VERPs and past programs, if you had a certain performance rating because that was the criteria, they'd come to you and say, where are you going to be transferred? What job do you want to do? In this particular situation, everybody that they reached out to said, you know, your position is being eliminated. You know, we're not sure. We can't tell you anything. So the question is, if you unlawfully, improperly encourage people to stay, if the Third Circuit was going to be short by a cut in half and the only people that senators met with to discuss the future positions on the court were those considerably younger. Harder. Harder. All of a sudden, he has a long meeting with the senator, comes out with a big smile on his face, and that senator is the person that's going to choose to be the retention. The message to the older people on the court is clear, which is there's no spot for you. You have no choice. And then when you ask, when's my meeting with the senator? Do I have a job? You're told, well, we can't really speak to you about anything. Isn't it true, though, Counselor, that not everyone who was retained got that tap on the shoulder? It seems to me that even accepting that the company was trying to steer this in a direction that management favored, you still have to show that it's actually involuntary. And isn't there a distinction in this case where, yes, your clients were getting indications that things may be problematic for them if they did not take the VERT, but isn't it different than a case where the boss summons you into the office and puts the retirement plan in front of you and says, take it or you're going to be fired. That is truly involuntary, but that's not what happened here. Well, we believe that's a credibility issue. It would be much different if you were called and other people were called in the office and there were meetings about their future plans and they came out of the office and told everybody, we won't even pre-select and we're included in the plan, and then we're not being called in the office at all. Instead, you're leading a given meeting that says, if you don't accept the VERT, the line officers are likely to resolve. But that's my point, likely. We're dealing with probabilities here, not certainties. And aren't there always going to be people who have the difficult choice of playing the percentages when faced with taking the VERT or staying on? All you can do is play the percentages. Well, if it's a fair game, and assuming that you're playing poker and everybody is playing the same game, I agree with you. The cards are dealt at random. But if during the poker game, the younger people at the table are being tapped in the shoulder and told what the other people's hands are, then it's no longer a fair game. I assume that you wouldn't want to play poker where the other people at the table have knowledge and information that you don't have, which is your hand is higher than this particular hand or maybe blackjack is a better example. Your hand is higher than the dealer's hand. You might want to bet. I don't believe that's a fair game. In this particular case, the VERT system, by definition, of what the Pittsburgh executive said, was a rigged game. Certain people were told. There was leaking everywhere. Henderson. But there's always going to be scuttlebutt. There's always going to be shop talk. Aren't you really asking us to say that this VERT vehicle is inherently involuntary and that companies shouldn't be in the business of offering these retirement plans to folks? No, a VERT is a fantastic tool. It's a benefit. We're not complaining about all VERTs. What we're saying is you can't create a retention list. You've got two choices. That's what you asked here. We could have a direct... Why can't you maintain a retention list that says, if we had our druthers, these are the employees we'd like to keep. What is there inherently unlawful about doing that? I go back to my original question. If you look at the roster, the retention list they have, all the older employees have the notation pension next to them. But that list was created before the VERT was decided on. Well, that's a fact issue, which is, did Dennis Jones know? Is it really a fact issue? I don't think so. This voluntary retirement plan for Pittsburgh had been planned for months. Famous has had multiple voluntary retirement plans. Generally, when they had a RRIF, they would have a voluntary plan. It was no secret that there was most likely going to be some sort of pension offer. There was no legitimate business reason for including pension on that retention list. I go back to my original question. Why do you have to play fair? Why do you have to have a legitimate business reason, as long as it doesn't violate a statute? There were older people who were retained, and there were younger people who were let go. Therefore, where is the inherent age discrimination? What you tell us is they didn't play fair. All I'm saying is, in this capitalistic world, you don't have to play fair. You're not allowed to consider an employee's subjective retirement intentions when you make a retention list. Why not? If you're going to close down an operation or reduce an operation, isn't it good management to think about, in your galvanizing plan, what sort of management you're going to need, and to think about the employees that you have, who you might want to put in those spots? Isn't that good business planning? That might be good business planning, but the Pittsburgh and U.S. Steel's business plan was always the one and only factor, is what the Pittsburgh executive said. The one and only factor is performance evaluations in a RIF. That's the only thing. But we never got to the RIF. We didn't have to get to the RIF. That, again, is a fact issue. Once you create an involuntary plan, and all of a sudden Pittsburgh imposes a VERP on you, it's an issue of fact as to whether or not Dennis Jones... Not imposes a VERP on you, offers. Offers a VERP. But that's a management problem. A VERP is a huge management problem. If you want to pick and choose your employees, a VERP changes that for you. You can no longer pick and choose your employees. The employees are supposed to have the option to pick and choose. What law says that? What law says that? Yeah. Yeah. That you can't have a pension plan that's supposed to be a voluntary pension plan and make it an involuntary plan by telling people... Well, it's not an involuntary pension plan. They could have not taken the VERP and taken their chances at staying or being fired. And if the chances were equal among the pool of people in the VERP, Arisa wouldn't have a problem with that, and if it wasn't age-related, then there'd be no problem. They wouldn't run around and be found. But as soon as you consider people's retirement plans and age of the people, I think if you look at page 8 of my brief, you can see the startling age difference between the people that were included and not included. But you're again talking about the roster as the skeleton for the VERP. And I don't think even looking at the facts in the light most favorable to the plaintiff, I don't think you can meld the roster into what happened in the VERP. Well, once you have an employee... And the trial court found that Mr. Jones violated company policy by encouraging certain people to stay. Once you find... Once there's a fact issue on whether or not Mr. Jones voluntarily encouraged people to stay, isn't there also a fact issue as to whether or not Mr. Jones voluntarily encouraged certain people to leave based upon leaking the information, based upon the secret meetings? It's a fact issue. And to say that the involuntary plan disappears is another fact issue, which is to say you took the time, you picked these people, and you just totally abandoned it. It's in your jury. You didn't share it with the employees. You didn't read it through the plan. This is going to be your preferred plan. You know, you called our attention to page 8, which of course we have because I made some notes on it. We've read. But if you see, more than half of the people on the selected managers list are over 40, which is the protected age of the Age Discrimination and Employment Act. So I think I'm right that it's more than half. So you want us to draw the inference that because younger people, some younger people were selected, that there was a violation of the ADA. I'm not sure that we can draw that inference enough to say that it's a jury question, which is really what you want. Judge Brody went very carefully through the list and explained this to each individual why there was not enough evidence to go to the jury. What was wrong with what Judge Brody found? Well, this court on multiple occasions, including Judge Roth's opinion in the West case, have said you look at the totality of the circumstances over and over again. You don't rip little pieces of evidence apart and throw it out. You've got a paper on itself that says performance evaluations for one group and pension status for the other group and a pre-selection of the younger employees. And this over 40, under 40 is a distinction. The question is, were they in the Showwater case? Everybody was older. The issue is, are the people on the right side significantly older than the people on the left side? And if you look at that list, your oldest person on the left side is 53 and your youngest person on the right side is 51. And every single one of the younger employees is on the included list and not a single one of the younger employees is on there. Okay, let's hear what U.S. Steel has to say in response. You've saved a substantial time for rebuttal. Okay? Unless, is that all right? Yes. May it please the court, my name is Chrissy Sharp from the United States Steel Corporation. On behalf of U.S. Steel, I respectfully request this court to affirm the decision of the district court. While the plaintiffs do make an attempt to raise issues in this case, I would submit to the court that the issues that they raise are merely superficial issues. They fail to raise any genuine issues which are of material significance that would affect the outcome of this case for the following reasons. First of all, the plaintiffs failed to show that this was an involuntary plan, that they were constructively discharged. They can't make the prima facie case and therefore they don't, they're unable to show that the experiences that they had at work were so intolerable that they were forced to resign. The work was offered strictly as voluntary. They came out and they said, listen, you don't have to take it, you can continue working, but if you do, there's a risk that you may be laid off if not enough people take the VERP. If you're going to offer a VERP, are you forbidden to talk to any employee about, hey, we really like you here, we want to keep you? No, you're not. Actually, it was the policy of the individual who designed the VERP. He wanted it to be voluntary, so that was a company policy. So if, in fact, Mr. Jones did violate that, it would be up to the company to reprimand him on that. But the way that it was designed, it didn't even have to be designed to be offered to everybody. Well, if it was, if Jones violated company policy by saying to three employees or four employees, we don't know exactly, you've got a place, don't leave, is that sufficient to make the VERP violate the ADEA? No, it's not. And what happens, I think if he did it to an extent that it was to the point where every older person knew that every other young person was told, then I think you could say that this reaches that level, but you don't have that here. Well, wait a minute, wait a minute. As long as you are willing to accept that, then doesn't it become a jury question? In other words, if you accept the proposition that if management can and did favor younger people for retention, then doesn't the jury have to decide whether that happened to such an extent that it violates the ADEA? No, Your Honor, because I don't believe that I said that he did do that. They tried to present evidence that he did, but first of all, they didn't produce any admissible evidence that he did that. There was evidence that Dennis Jones went into meetings with some people, but there was no evidence what the meetings were about. There was hearsay testimony that went along with it. He went into meetings with, offered a position to stay. No, Your Honor. Actually, there's no direct evidence that anyone was offered. There were strictly rumors, and what you have is you have a clerk in the personnel department who works strictly with union personnel. She has no dealings with management other than sometimes when they have to request union personnel for whatever projects they're working on, that that's their only interaction, and she was the one that said that these couple of individuals told me that they were assured of sting, and I would submit to the court rumors of two people. Well, that's not a rumor. That's evidence of what somebody told her. But that was not admitted for proof of the fact. That was admitted as evidence of the state of mind. That's correct. So they were to believe that they heard from this clerk that certain people had gotten assurances, but they never had any direct proof. They never had any validation. They said they heard this. This all came through the grapevine. One of the plaintiffs told the other plaintiffs, and they said, oh, they all discussed it through the grapevine. But didn't, I'm trying to remember, didn't a couple of the managers who stayed acknowledge that they had meetings with Jones? They did, and actually they said it was not discussed or they brought it up, and they said, I'm planning on staying, and Jones said to them, well, you know, there's no guarantees. So, but based on what they knew, they knew there were just a couple of rumors out there. As a matter of fact, Mr. Battucci says management never purposely leaked the rumors, that everything that was communicated to him came from, his knowledge came from Roy Williams, and that management did not answer his questions on what he should do, and that he specifically said he knew that they would need roughly 16 to 18 people, but he did not want to gamble with his family's financial well-being. And same with Mr. Embrico. He was one of the first to sign his form because he felt that by getting his form in right away, he would secure his family's financial well-being because if something happened to him before he signed it, then his family wouldn't get the increase in benefits that the VIRB plan was providing to them. Did the form have a waiver of suit or an agreement not to sue? It did not, Your Honor, not to my knowledge. Isn't it clear, though, Counsel, drawing the inferences in the light most favorable to the plaintiffs that the company gave some people privileged information? It appears to me that the company was giving certain people privileged information, and how could these plaintiffs make a fully informed decision if they're not getting the same caliber of information as some of their co-workers do? Well, Your Honor, in the case of Gray v. York Papers, there was kind of a similar situation there where you had a lot of rumors going around, and you had this Ms. Gray who was threatened to get a demotion down to a lower beat on the paper. She said there were rumors of two of her co-workers being forcibly terminated, and then also... But the court said regardless, those rumors and whatever you experienced there was not enough. It didn't rise to the level of involuntary discharge there. Wasn't that because Gray should have taken some steps to inquire? Yes, that is one of the... And here these folks did inquire. They went in and they said, hey, what's the deal? You don't have a job for me, and they got heads lowered. They got silenced. They got bad vibrations from management, did they not? Well, when they went to management, the questions they asked were, should I take it, should I not? Do I have a job? They were told, I can't guarantee whether you have a job or not. I don't know. It's your decision. In the past, they got reassurances. There was a history. It seems like the culture at this plant was you kind of walk in and you either get reassured or you don't. And if you don't get reassured, you look to see if there's plastic on the floor behind you. Your Honor, I would disagree. There's no admissible evidence in this case that there were ever reassurances given out. And just the fact that there are rumors of assurances, they want you to say rumors of assurances plus knowing that you're not going to have a job should be enough to equate to constructive discharge. And I would submit to the court, you don't want to do that. It falls very short of what's out there already, and it creates a situation where the rumor mill starts controlling what's going on. Would you agree, do you, that, well, do you, that Jones violated company policy by speaking with some of the employees? Your Honor, according to his deposition testimony and the others, they say that they didn't have that conversation, and there's no... Well, he met with, I mean, there's no question about the fact that he met with selected managers during the VERP election period, and that company policy did not permit that. Well, he met with them. I mean, he's got a business to run. I mean, there was no indication that he met with them to discuss the VERP, although one of the individuals testified that he, that the younger guy said he was the one that brought it up and said, I'm taking it. But, you know, younger people are in a much different situation than older individuals. For instance, Mr. Luxney said, you know, he was not in a position to take VERP. It wasn't enough for him. He was getting his MBA paid for by the company in return for some years of service. And what would happen is if he took the VERP, he'd have to pay back his tuition. However, if he was involuntarily laid off, if he took his chances, and he got laid off, he wouldn't have to pay back his tuition. And other people, even the younger individuals testified, some with maybe four years' experience, their offer, roughly, for four years of service, their offer in VERP was $12,000. It would be more beneficial for them to take their chance, get laid off, because if you get laid off, you get 60% of your salary, and that would be much better than the $12,000. And there's nothing that even says that the company, first of all, I mean, if they chose to give this VERP to everybody, they didn't have to offer it to the younger people because, for the most part, younger people don't get it. But what was the company policy? Just tell us what was the evidence. What was the company policy vis-à-vis the VERP? It was to offer it to everybody. Okay. And what was it with respect to meetings? There was basically that information should not be given out. Was the policy that you could not meet with people or that if you met with them you could not give out information? There was nothing against having meetings. I didn't see that anywhere in the record, but it was just that you should not give out information. You shouldn't tell people what to do. You shouldn't influence their decisions. But at least one of the 16 people who were retained had been privately reassured by Kennedy during the VERP election period. That's true. I mean, that's in the appendix. He did indicate that Mr. O'Reilly had a degree in metallurgy, and those people come by very rarely. And, yes, he did want to keep him for their quality assurance. And so he did violate the policy in at least that one respect. And a jury might find that they violated it in other respects. Your Honor, I don't think that plaintiffs ever meet their burden. First of all, no one even knew about O'Reilly. That never came up in any of the testimony. That's something that Mr. Kennedy testified to on his... But it's in the record. Yes. I mean, we have a finding of that. We can't get behind that, that Kennedy assured at least one of the 16. And we also know that at least three of the 16 who were retained had met privately with Jones during the VERP election period. That's in the record. They met with him, but that was in group meetings with older people there as well. That wasn't just one-on-one meetings. Is that clear from the record that the three met? The finding is at least three of the 16 who were retained had met privately with Jones. I'm taking that from the appendix, page 413. Your Honor, even if they did meet with him, I... Well, that's a big difference to say that that didn't happen or that even if it happened. Did it happen or not? I mean, wasn't that the finding? My understanding is that there were other people in those meetings such as... Well, what does privately mean? Your Honor, if he did, in fact, meet privately, there's no indication... They, three. ...that Dennis Jones was the one that brought that up, that the younger individuals did indicate they may have brought it up to Dennis Jones, and he says, I'm not giving you any assurances. So it's not just the fact he met with them. It's that he has to have provided them with information that they shouldn't have. Go ahead. Additionally, Your Honor, I would also submit to the Court that even if the plaintiffs do show a prima facie case for age and race discrimination, they fail otherwise to show that U.S. Steel's desire for people with technical backgrounds was pretextual or that we specifically intended to act with discriminatory animus. The roster does not speak for itself contrary to what the plaintiffs say. Actually, what Dennis Jones says is the number one person I wanted to pick on my wish list here, that was Frank Kuhn. He was listed number two on the list, which is conveniently left off the plaintiff's list here because Frank Kuhn is 57 years old with 36 years of experience, much the same as the defendants on this case. And half the people that they even list in their brief were, say, systems people's jobs that they weren't even qualified to do. The roster does contain a first list of people and the second choices. But the second choices in systems, a lot of them are younger. That's completely neglected in the plaintiff's brief. So, I mean, I don't think they've presented on those accounts a strong enough evidence to show that there was any kind of pretext, that this is something that basically everybody on the top half of the list did in fact have technical backgrounds. And that's a legitimate reason that U.S. Steel has. And they don't ever show that U.S. Steel specifically acted with discriminatory animus. Each of the plaintiffs were asked. Is that something that the Supreme Court says you can do on summary judgment? I thought intent was something that had to go to the jury. Am I wrong on my understanding of what the Supreme Court said at the end of the case where it dealt with intent? Your Honor, I think that they have to show, but for the protected characteristics, but either age or race, they have to show that U.S. Steel acted with discriminatory animus. Yeah, but can the question of whether the defendant, an employer, acted with intent, which is discriminatory animus, be decided by the district court on summary judgment? Or does that have to go to a jury? Well, Your Honor, at summary judgment, it's the plaintiff's burden to produce evidence to prove that by a preponderance of the evidence. And I would submit to the court that they have not. Well, can't you infer if the facts are the way that... What does the district court say about discriminatory animus? That they have to, at this stage, when you get beyond the prima facie stage, they have to produce evidence with significant probative value to show that there was either pretext or discriminatory animus. Is that what she said? And did she say that there was no discriminatory animus shown? I believe so, Your Honor. Can you show us where in her opinion? It's a long opinion. I thought she just ended up saying there was no constructive discharge. I'm not sure that I remember that she did. She may have. That's what I asked you. Did she say anything about the animus? I just don't remember. We have a lot of cases. Each sitting we can get 40 cases. Your Honor, I can't seem to find it either, but I mean... It seemed that she said that there was nothing to counteract the statement that the decision was based on the technical background. So I don't know that she got into the animus question because there seemed to be nothing on the other side of the equation. Counsel will momentarily tell us why that was wrong, I think, but that's what she said. Because I understood you to say that she said that there was no discriminatory animus, and I didn't remember that. I didn't necessarily say that she said that. I said that plaintiffs would have to prove that to meet their burden in this case. Okay. Thank you. Thank you. Thank you. I believe the case is the Sheraton case where this Court decided on Bonk, and then in Reeves the Supreme Court's talk about whether or not you need pretext plus. In this particular case, Judge Brody found that... Well, we held in Sheraton that we didn't have to show pretext plus. I know I made that opinion. Exactly, Judge Slover, and the Supreme Court in Reeves. So I think there's no extra fine that we have to show discriminatory animus once we make a showing of pretext. No, but have you made a showing of pretext? Well, I will begin. If you look at Judge Brody's opinion, she says, Thomas is correct that the creation of the roster before the verbal reading from page 28 was offered tends to show that U.S. Steel had already preselected a certain cadre of managers at this point, making further legal inferences in his favor. A jury could also find that U.S. Steel made efforts during the election period to retain that cadre of preselected managers in violation of company policy. Yeah, but she also said on page 28, well, what's 28? Here, Thomas has failed to show pretext. Exactly. He's failed to show pretext. We agree, Judge, but if you look at the Shawar case, you look at post hoc manipulations. In this particular case, both Garreau and Wynkoop, the U.S. Steel executives, say when you do an involuntary plan, when you do a RIF, the one and only criteria you can consider is performance evaluations. Nowhere on the contemporaneous planning documents did Mr. Jones write technical background or anything about their degrees. I think we'd all be with you if this were a RIF, but it's not a RIF. As Judge Roth has pointed out a couple of times, they morphed, they looked at what might happen if there were a RIF, but they were able to avoid a RIF. Isn't it a good thing to avoid a RIF by offering people early retirement? Well, we believe it's a fact issue as to whether or not Jones ever abandoned his intent to have an involuntary RIF, that he met with at least three employees. Kennedy himself was reassured by people in Pittsburgh. Kennedy reassured at least two people. So that's an issue of fact as to whether or not they threw this planning document that was sent to Pittsburgh that was the predicate for them redoing the galvanized line that didn't consider performance evaluations. They just threw this away. And when Dennis Jones was sitting across, he didn't discuss, well, you've got a job. Not only are you in the plan, but you have a job. Here's the job you have. This is what you're going to do. That's a fact issue. Let me go back to a question. I have found what Ms. Clark, is it Ms. Clark? Ms. Sharp. Ms. Sharp couldn't find. And that is in the district court's opinion, which is on page 28 of the part of it, she says specifically, without that connection, it cannot be reasonably inferred that age was a motivating or determinative factor in U.S. Steel's preselection process. So she did make the determination that there weren't enough facts from which one could infer that age was a motivating or determinative factor. Let's hear from you on that. We believe that that finding in footnote 23, that pension is not synonymous with age, is absolutely inconsistent with what she wrote on page 27 of her opinion, where she says pension on the roster means Jones guesses about retirement preferences. So how could you not say that the word pension, in the context of that particular document, which we contend continued well into the RIF through meetings and private meetings and reassurances, how can you say that pension means retirement preferences, and then write a footnote on the following page that says pension status may involve factors unrelated to age. We know in this case what pension status meant. Pension status means I think this guy is going to retire. And during this process, I want to keep these guys. I've submitted a plan of management. I think this is critical. I didn't think about performance evaluations. I didn't think about experience. I handpicked the guys I wanted. But we know that Jones, let's assume that Jones violated the company policy. So what? What does that show about the company, whether what the company did violates the age discrimination? Well, then you're going to revisit Gray and you're going to revisit Conner, because in Gray and Conner, what this court held was one of the issues you can choose about whether this is voluntary is is the choice free from fraud or misconduct? And if a company violates its own policies with respect to how they do a RIF, can you find that it's not free from fraud or misconduct? Could a reasonable juror say a guy that violated company policy and had private meetings may have also tried to push this RIF through? It's a fact issue. Dennis Jones is not infallible, and the jury should weigh these credibility issues. Any questions, Jay? Thank you very much. Thank you, Judge Sloan. We'll take this case under advisement. Thank you. Ms. Sharpe, your name isn't on the brief. I'm not sure, Your Honor. We had a lesson in kind of reorganization in our law department, and I- A RIF word, bro. A RIF word. Okay. But you are a third, sir. You are a member of the bar. I am, Your Honor. I did submit that paperwork. Okay. That's fine. Thanks. Thank you. Thank you both. We ask that the court camber go to court at 9 30 a.m. Were we just going at 9 30 in the morning? Ten o'clock. Yeah, but the other panel started at 9 30. Okay. Oh, yeah. Is the other panel sitting today?